I want to welcome you here today and just remind you of a few traffic signals that we have. One of them is when the yellow light comes on, you have two minutes left in your argument. When the red light comes on, we ask you to conclude as quickly as possible unless you are answering a question from the court. We have read the briefs and record excerpts. We are not necessarily familiar with the entire record, so we appreciate record citations. Can you hear me? Oh, okay. I look particularly attentive. So we appreciate the record citations. And with that, we'll call the first case, number 18-60115, Cantarero-Lagos v. Whitaker. Ms. Maroof? May it please the Court. I don't wait. I think the dial, try the dial. No, no, off to there. Yesterday was beating back on us. Please speak up. May it please the Court. My name is Fatima Maroof, and I direct the Immigrant Rights Clinic at Texas A&M School of Law. I represent the petitioners in this case along with my co-counsel from the University of Houston Immigration Clinic and the Harvard Immigration and Refugee Clinic. This is a case where the petitioners articulated one particular social group to the immigration judge during the closing argument and then articulated a semantically similar social group to the Board of Immigration Appeals, which the Board refused to review. We are asking the Court to do two things in this case. First, we are asking the Court to apply a traditional pleading standard to asylum cases based on membership in a particular social group instead of the exceedingly strict exact delineation standard. Second, we are asking the Court to require the Board to make a legal determination about whether the refined social group is cognizable based on the evidence in the record. I will discuss each of these issues in turn and then address retroactivity. Let me just ask you something fundamental. What is it that the petitioner fears? What's the nature of the persecution she fears if she's sent back to Honduras? So the persecution that she fears— I mean factually from the record. Sure. She fears gender-related harm from her family or from others as well as harm from gangs, but that's not the issue before this Court. Well, but we're deciding this case, you understand. Yes, absolutely, Your Honor. Because the Board never reached those issues about whether she had experienced past persecution or whether she has a well-founded fear, neither of those issues are before this Court. The only issues before the Court now are these legal procedural issues about the standard, the pleading standard for a social group and whether one can refine the social group on appeal based on the same evidentiary. Well, we don't even reach the legal issues, it seems to me, unless there's some evidence that suggests there would be proof on remand. Otherwise, it seems to me you're proving the government's case because the government says this is not a semantically similar definition of a particular social group, and if you say it needs to be remanded for more facts, that implies that it is not a substantially similar particular social group. Actually, Your Honor, we're not saying it needs to be remanded. We believe that the Board can decide this case based on the record. I think in a footnote in our brief, we mentioned if the Board— Well, you said it had to be remanded to decide the facts. No, no, I— You did say that to Judge Davis, didn't you, or did I miss hear? No, I was saying because the Board never reached those other issues based on past persecution and well-founded fear, if this Court were to find that the Board can review the social group, the legal issue of the social group, then the Board, if it wanted to go further than that, it could address those other issues. But those other issues are now before the Court because they were never even addressed by the Board. Well, I will not be quarrelsome and interfere with the rest of your remarks, but I must say that there must be something in the record that enables you to answer Judge Davis's question, which is what persecution, just fearing harm from family or from gangs, I mean, that's not different from the fear that individuals have in certain parts of Houston. I understand that you're—that the Court may have questions about whether she will ultimately succeed in her asylum case if this case were remanded, but that's really just not the legal issue before the Court at this point in time because the Board never addressed those issues, and this Court can't address them in the first instance. Yeah, but let me ask you this. If there are factual issues that I.J. would need to decide, I mean, don't you agree that it was proper for the Board to decline to find her, that she was—find her entitled to asylum? So the only basis for the Board's decision was its finding that it could not review the new social group, which we believe is a legal determination. In fact, it's not just our belief. The precedents universally say that whether a social group is cognizable is a legal question reviewed de novo. So there's no factual issue here that we're saying the Board should address. Those subsidiary elements of a social group that the government points out are indeed factual determinations, but the reason that they're not necessary here is there's cases saying that an I.J. doesn't even need to make those subsidiary factual determinations for the Board to decide if a group is cognizable. And in our specific case— Give me an example of that, please. So there are cases where I.J.'s never addressed immutability, particularity, or— Give me a case of that. Suppose if it were a Jew from Russia 30 or 40 years ago, I would certainly understand that, where everybody realized that Jews in Russia were persecuted. Give me a more recent case where you say no subsidiary— because we're handling a fair amount of immigration cases now, and I don't remember anything like that. There's some cited in the brief, Your Honor, that I don't remember off the top of my head. But, for example, let's say there was a case based on tribal membership or past status in the military or sexual orientation. These are well-established social groups. And there are cases where judges will find that a group is or isn't cognizable without actually going through and addressing. In fact, our case is one such example. The judge in our case never addressed immutability, never said whether or not her group had an immutable characteristic. Maybe that had something to do with the facts here. It's possible, Your Honor. So this is a case where the— I mean, you know, of all the cases in which to raise this issue, this seems like a very peculiar one because this woman was assaulted by her birth father 15, maybe 20 years ago at this point, and she never saw him again. And that was the social group that they were—that apparently you're trying to define. Yes, Your Honor. I think the important thing to keep in mind is that the issues before the court aren't about the strength of this underlying asylum case. They're about the important new rules that the BIA announced in its published decision, which is applied across the board now, and has resulted in immigration judges summarily denying applications based on social group within the first 30 days, issuing orders that look like orders for summary judgment, basically. Go ahead. But, you know, there are a lot of cases where this large legal issue we'd love to reach, but there are underlying facts that prevent us from doing that. I mean, it's just obvious from the record that there are facts here that would preclude the BIA deciding the case. You know, we decide cases. We don't decide legal issues. I think, you know, if the BIA had made an alternative finding that even with the new social group, assuming this new social group were allowed, we would still deny this case because there was no well-founded fear, right, or no past persecution. That would be a different scenario. In our case, the BIA never said that. It didn't address those other elements of asylum at all. All it says was we're not going to address the new social group, so there's no social group. Well, of course, what we're looking at here is, to me, a BIA analogy with practice in the Article III courts. And in the Article III courts, if you plead one cause of action, in fact, we had a case like this yesterday, you plead one claim in the trial court and litigate that to judgment, you can't come up in the appeals court and say, well, the facts actually suit this other claim. You can't do that. So why is that not acceptable for the BIA procedures? So there's two points. One is in Hanyak, which is a Fifth Circuit precedent, the court actually did allow revision of the social group. They said they were not significantly different. And in the same way, our two groups here, we argue, are not significantly different. They share the same key characteristics of gender, age, and status. Additionally, an asylum case is traditionally liberal pleading principles apply. So in a case like Edward, another Published Fifth Circuit case, the individual had never even raised his claim under the Convention Against Torture, didn't mention the words Convention Against Torture, didn't check the box on the application indicating he was applying for that relief, and the court found that he had adequately raised it. Well, a lot of judges will occasionally rule on things that are essentially waived just to demonstrate to the applicant that they would have lost anyway, right? And that happens. But you're trying to transform that rule of discretion and generosity into a mandatory rule, it seems to me, that means that there is no limit on what the BIA has to consider on appeal. There is a limit, Your Honor. It has to be a group that is substantially similar and that they can consider based on the same evidentiary record. Wait. Substantially similar? Substantially similar. And same evidentiary? I mean, I know that's in your... So the same evidentiary record is key. You can't just keep revising your social group to different things. We're not saying that, Your Honor. We're just saying if the BIA... So you agree with the outcome in our recent Antunes Blanco case? Yeah, and Antunes is very distinguishable because... You do, right? Well, from what I can tell from the short decision, and I haven't seen the record, he didn't raise his social group below at all, and then on appeal he came up with a social group of LGBT and AIDS activists. That's very different than here where we have two very similar social groups. Yes, they're semantically different. But all the attorney really did was cut out the part of the social group that included persecution within the definition of the group and moved it out to where it's supposed to be as a separate element for asylum. See, I don't see that the two groups are similar at all. Okay. Cut out the sexual abuse part of it. Right. You've got... You have Honduran... Females, males. You have... My problem is should we try to decide a rule of law when we can't see from the record any plausible factual basis for the PSG? Well, I think in this case the board used this case to announce two brand-new rules of law. And so what we're asking this court to do is not allow such a rigid rule that the board used this case to announce, right? The very rigid pleading standard of exact delineation does not appear in any other area of law. Why should we single out asylum cases and specifically particular social groups? Well, let me ask you a question. Is the definition of a particular social group case-specific or is it a more general definition? There is a general definition that the board has kept modified. What I'm saying is can any... This lady with this background comes and she has two definitions of social group. The next lady comes in with exactly the same characteristics. Would she use this social group or can she make up her own third social group? She can make up her own and for whatever reason. Well, then what is there in the definition of persecution about particularity and social visibility? How many socially visible groups can one be a member of? There's no specific finite limit on... The criteria have been challenged over and over because they are so vague. So there is a circuit split still on the social... Well, they're not necessarily... That's what I'm saying. They're not vague. If for women coming from Honduras you can point to something such as, let's say, Jews in Germany, people who have tattoos on their arms are presumptively going to be victims of persecution. That is particularity and visibility. There are facts that transcend the individual, right? And similarly here, there are facts that transcend the individual. We're talking about gender, family status, and age. Both groups have those characteristics. Well, there are thousands and thousands and thousands of people that have a certain gender, family status, and age. The size of a group has never been a limit. There's thousands and thousands of Jews. There's thousands and thousands of Christians. Yet religion is a basis for asylum. We can't use the size of a group... But that's because that's in the statute. That's in the statute. As this particular social group. But the social group has to stand out in the community as a discreet social group. How does this meet that requirement? So it meets the immutability requirement because it has gender as an immutable status, and family status is often immutable. You can't change who your family is. You can't change your age when you're at that age, right? It meets social distinction because Honduran society treats women differently than men. The failure to offer them protection, the lack of shelters, the other evidence that Ms. Contreras gave in her testimony shows that women in Honduras are not protected from family violence and therefore have a distinct social status. In terms of particularity, we can tell who's in or out of the group. Where's the evidence in the record that women in Honduras are treated differently because of family violence? Because evidence here is that, I mean, fortunately she was not actually physically assaulted by this man, but she never went to the police and never told anybody. So where's the basis for an assertion that there's proof in the record? It's in her testimony. It's just we had no country conditions were submitted by the attorneys in this case, unfortunately. So it's only in her testimony. But all of these questions that we're talking about really are not the basis on which this decision was made and are not the issues on appeal before this court. Whether or not you think she has a social group, whether or not you think she should obtain asylum, whether you think other women from Honduras should obtain asylum, those are important questions, but they're not the questions before the court in this appeal. The BIA never addressed them. I don't see how this court could issue a decision addressing those issues when the BIA never addressed them. Thank you. You know, to me it would be important that we have a case where the facts supported the PSG. And, I mean, should we decide a case before we have the facts that support what the petitioners claim? I think because it's a legal issue before the court, I understand it's not a satisfactory answer and it would be better to issue a rule in a case with strong underlying facts. No, it would be better if you'd cite a case that tells us we ought to do that. I think Honyak is that case. Huh? Honyak is that case. You can do it on rebuttal. Okay. Thank you, Your Honor. I'm not sure I agree with that. Thank you. Okay, Ms. Green. May it please the Court, I'm Susan Green for the government. Your Honors, the rule that you can't raise a new claim for the first time in appeal is not a new rule. That's a venerable rule. And as you pointed out earlier, Your Honor, it applies in Article III courts as well as in the agency. But in the agency, it has been applied for a very long time now, and this court has approved it and upheld it for a very long time. On her appeal to the board. Because they haven't exhausted those claims, right? Yes, ma'am. I mean, we, yeah. And her attorney argued to the Board of Immigration Appeals that he could change the particular social group at will, and he freely admitted that the first particular social group they raised was defective for a number of reasons, and I think that's the record in 77, 78. He freely admitted that he wasn't able to win on that first group that they raised, and that's why he switched to a second group, and he said that the board had no law that prevented him from doing that. Well, the board took that up and asked them to brief that. It got briefing on it. Because this is a very important point for the board. Because if you can raise a particular social group to the immigration judge and lose on it, and then on appeal, the appeal is nothing about what happened in front of the immigration judge. It's a whole new group. That raises factual issues. And the new BSG is not substantially different than BIA could certainly consider it, couldn't it? Right, and the board actually used some language about that. It said substantially different. I mean, they're not trying to, this is not about minutia. This is about important factual or important differences in the group. And this case certainly illustrates that, because there were very significant differences. Her first group that she raised before the immigration judge was single Honduran women ages 14 through 30 that had been sexually abused within their family and couldn't turn to the government. And the immigration judge specifically asked the attorney, are you satisfied with that group? He asked her to think about it. And she tweaked it in response to his comments that she ultimately went with that group, as was her prerogative to do. I mean, if there's one thing that's clear is the easiest way for an immigration judge to get in trouble is to ignore the particular social group that the applicant is trying to raise. This wasn't sandbagging some poor, unrepresented person. She had counsel. She did have counsel, yes, Your Honor. And the I.J. made every effort to give them an opportunity to define a group. I think that this is a case where the I.J. did exactly right, did what he should do. So this is not a new rule. It's an old rule that the board took the opportunity to clarify. This rule is not unlike what you would get from the professor's briefs. It's not a new rule. It's not some kind of dangerous or edgy rule. It's an old rule, and it's common sense. And it's common sense because the board and the immigration court are a two-tier system, and it's commonly recognized that the most efficient way for a two-tier adjudicatory system to work is to have the lower tier try the facts and try all of them, and the upper tier do review only of things that have been tried below. Now, the question that has been raised about whether particular social group cognizability is factual or legal, we have never argued that the ultimate question is factual because the board hasn't said that. The board has said the ultimate question is legal, but the board definitely has said that there are subsidiary questions. And, in fact, the professors say that in their brief that I spilled a lot of ink on this question, but I think it was worth it because if you look at page 9 of their reply brief, they ultimately concede that there are subsidiary factual questions. And the reason why that is important is because the applicant has the burden of proof, so those subsidiary factual questions are things that they have to win on. They have to prove and win. Was any effort made, because I'm not sure I remember it, to explain the nexus between the group and the alleged persecution, the redefined group, in this case? The redefined group? Yeah. Honduran women who cannot sever family ties. I'm sorry that I can't bring up... I don't recall anything that was a nexus because if it was family ties, it was what happened to her when she was 15, and it didn't have anything to do with gangs trying to extort her fruit stand or whatever. Right. And nexus, not only is a particular social group involved in factual determinations, but as you point out, also nexus and also the question of membership in the group, and the board referred to those as being two other factual questions. And I would say that in this situation it looks to me like the bigger factual question in her second group, the group she wanted to raise to the board, was whether she's even a member of a group of people that are unable to sever their family ties, because the testimony was... What is severing family ties? Well, I mean, that I guess is the big question, but... You grow up and you leave home? It doesn't mean, you know, you've got a decree of divorce from your family? What is it? I mean, that is not explained, but I would say that one thing, I mean, severing family ties in this case, she walked out in 2001 when her father did this improper thing. She walked out and never saw the man again. And her testimony in the record is that she was asked, do you have a relationship with this man, and she said no. She was with her mother for some time, right? Right. She was raised by her mother. Her father apparently left the family when she was one year old. That's right. Didn't she go back to her mother then? No. She never lived with her father, Your Honor. Mother, he said. She lived with her mother. Oh, yes, I see. Yes, she said that she could go back and live with her mother safely in Honduras. That's right. But did she live with her mother after the rape? Yeah, her mother reared her, right? Her mother reared her. Now, who she lived with after she was 15, I am not sure. She lived with somebody because she had the kid. Yes, she lived for several years with the father of her child, and I don't know. That may be in the record. I'm sorry I can't bring it up. But anyway, she said she was asked if she could go back and live with her mother and be safe, and she said yes. There wasn't any evidence that she was estranged from her mother, was there? No, no, none at all, no. I mean, just the opposite. She said that she could go back and live with her mother. Another important question is, was this particular group different, the one that she raised to the board different than the one that she raised to the immigration judge? I think that not only did her lawyer say it was different, but I think the evidence is that, I mean, or the formulations show that they were very different groups. And as I said, the first one included these problems that it was circular, that it was defined by the persecution, and that was something that was key to the immigration judge's decision. He said, you know, if this group was people who were sexually abused within the family, that is not why the father victimized her because she wasn't a member of the group until the father victimized her. So the fact that she brought up these groups and the immigration judge addressed them correctly, and then it turned out that, you know, she brought up a different group where those things weren't relevant, just shows that this could become a feedback loop, that you, if you could truly change your particular social group on appeal and require a remand for more fact-finding, these cases would never get over with. And that just can't be the way that it works. That's not a feasible way. How do you read this case that they appeal from? I mean, the opinion. I mean, the BIA kind of announced the rule in different ways. At one point they said the rule has to be exact from what the PSG was announced in the IJ with what you claim here. And then they said in other places it has to generally be the same or substantially the same. I mean, how do you read the opinion? Well, I mean, they picked out the exact delineation language from an earlier Board of Immigration Appeals decision, that matter of AT decision, where they had used that. And they did use that language. And I will point out that this Court has actually quoted that language with approval in recent cases, the 28Js that I sent. I don't think that ought to be the rule. Well, I think that the Board also used the substantially different language. And I think it's so many legal tests, it's very hard to say what those things mean in the abstract. I think what the Board was trying to tell people was everything that's material, that's important, you need to get in your group. And they were simply pointing out to the litigants that you need to include the things that are material, that we're going to have to be examined by the immigration judge. I don't think that it was saying that, you know, it's a difference, you know, if there's a difference in spelling or something that's, you know, two ways of saying the same concept, that that's going to prevent you from proceeding on your appeal. But if it was something that was really that minor, this wouldn't be a big point. You could just say, yeah, what I said in the immigration court. We wouldn't even be fighting about this. And there was a question asked earlier about particular social groups and why there are so many of them. If you look at how the Board has interpreted particular social groups, they're talking about groups that are recognized by the people in society. If you look at their leading case, the matter of MEBG, and they talk about what these groups mean. They say it's socially salient, that they're factions. They say that generally people that are in such a group are going to know they're in a group. So it's not like it's some word game. It's supposed to be something that even pro se applicants, even people that are not educated, are going to know if they're in a group that's really an important group in their society. And if it's a group that's likely to get them mistreated or persecuted. So I think that a lot of this- Does persecution require government persecution? Persecution, the word has been interpreted by the Board and the courts before it to include the concept of some governmental role, which is usually described as that the government is either unwilling to control- either the government is behind the persecution, or if it's by a private actor that the government is either unwilling or unable to control the private persecutor or to protect the applicant. So, yes, it is a term of art. I mean, in just definitional terms, you know, Honduran women who cannot sever family ties. What does the government have to do? Well, I mean, the fact that the governmental role does not have to be part of the articulation of the particular social group. That will come in the proof about proving persecution. I mean, there are many elements that you need to prove for- Part of her original thing had something to do with gangs, or counsel said that. And are there cases that are saying that these Central American countries, for instance, either assist the gangs or do not do anything to control the gangs? Are there cases that have granted persecution on that basis? There are lots and lots of asylum cases out in the country, and I don't want to say what exists out there. Well, does it depend on country conditions? The unwilling, unable analysis depends on the evidence in the record, and usually the evidence in the record would include, like, State Department reports and that sort of thing. But there certainly are lots of cases that say that these governments in Central America are doing their best to control the gangs and that they certainly do not permit it to happen willingly. Certainly they're trying to fight it. They have serious problems to deal with, but they're doing their best. So that is an element. We get those periodically. Well, you know, it's odd to me that the BIA didn't just say they're going to lift some of these questions of fact that we've been talking about and send it back to the IJ. It looks like maybe he was trying to draw a red line and say, look, it's got to be the same when you come up here. Well, I mean, I think what they were trying to do is not remand this case because the countererrorist attorney in the board pretty much conceded that the thing that they litigated before the immigration judge wasn't a basis for a claim. And the board has an interest in not having to send things back constantly. It can't be this, you know, revolving door. Didn't you also say that there's, I mean, I think in your briefing you said there was a problem because if the BIA had undertaken to look at the facts and say that even under the newly defined social group she would lose, then it would be vulnerable on review, right? Yes, Your Honor, and with the 2002 standard of review regulation that the board operates under now, the board can't make findings of fact. I should have mentioned that before. And so when they do that, they wind up getting reversed, or often when they don't think that they're making findings of fact, often they think they're just reviewing, but the courts often decide that, well, they're actually making findings of fact and get it sent back, so we have to start all over again. So, yes, that is a very important point, that if the board continues to operate under this regulation, which, you know, it has to, it can't get in the business of finding facts because then they're going to wind up being reversed and this whole thing, you know, starts all over again. What's the alternative, though, if they find facts that are in dispute? Don't they have to remand it? Well, I mean, if the regulation says that if the case can't be decided without deciding facts that are in dispute, they do have to remand. But in this case, the board was making a point to say that's not the case here. There is no reason to remand here because they have abandoned their first particular social group and this second particular social group was not preserved, so the case can be over with. And I think that they were trying to make the point that this is a housekeeping decision, and I think it's actually an important one to put people on notice that if you think things are important for your group, you need to articulate it in the immigration court and not think that you can change later. People should have already known that. As I said, I started out saying this is not a new rule. People should know it, but it apparently needed to be reemphasized. You know, I think that I may have already talked about everything that I thought. Judge Davis was concerned about whether we, in relation of the facts to the questions raised on appeal here, and do you think it's appropriate for us to say anything about the facts in order to decide this case? The fact that the facts don't seem to show a danger. Right, they don't seem to show, right. If we had gone under her first definition, well, under either one, it doesn't seem likely that she would have prevailed. I mean, whether there are issues of fact is a question of law. So the court of appeals can always say that there was no reason to remand something because there was not a case made below. Ultimately, if there is truly no evidence, a complete lack of evidence on a disputed question is a question of law. But I think that it's also true that the question that was before the board and that the board decided is an important one, and I think we should win on that as well. If we weren't to win on that, then you might well decide that there was simply no evidence that she had a well-founded fear because, as you said, she walked out in 2001 and she never saw the father again. And she's much older now. But, I mean, again, that goes to the question of whether there is any evidence at all. That isn't how I had thought of this case, but it's possible. Well, okay. I wasn't trying to constrain what we might do. I was just asking. If the court has no further questions, I would just ask the court to deny the petition for review. Thank you. Thank you. Ms. LaRouf. Thank you, Your Honor. I would like to point out that at the time this case was decided, matter of ARCG was good law, and that law at the BIA accepted a definition of the social group as married Guatemalan women who are unable to leave the relationship. The attorney in this case defined Ms. Contreras' social group in accordance with that precedent, which was a precedent at the time. After WYC was issued, the attorney general vacated matter of ARCG and issued his decision in matter of AB. And in that case, interestingly, the attorney general himself reformulated the social group. It went from El Salvadoran women. But that has nothing to do with what does that have to do with this case. This is not a married woman. This is not a current domestic. I mean, what are you trying to get at? What I'm trying to say is her definition of Honduran women and girls who are unable to sever family ties has the same characteristics of gender and inability to leave the relationship that the board said were the key characteristics of the group in ARCG. And the board applied ARCG to unmarried women as well in subsequent unpublished decisions. Did the BIA even cite ARCG in its opinion here? I don't believe it even addressed that issue because it wasn't addressing the viability of the social group. That's why this court shouldn't address that issue either. I think the fundamental point that Ms. Green made is that we have always held that an issue not raised before the IJ is waived. Except we have all of these circuit courts considering cases where the social groups were not included in this court. As I said, judges can, well, I mean, but we have always held, I mean, that is a rule. In fact, the case that you cited, the Third Circuit case, it says the same thing. When you don't, when you fail to raise something in the administrative, properly in the administrative proceedings, you waive it. And why isn't the definition of PSG a subset of that general rule? So the question is not did she raise it because she obviously raised PSG as her ground. The question is how specifically did she have to define the PSG? And has this court ever required exact delineation for pleading? I haven't found any case saying exact delineation is the standard for pleading. Well, if you're going to, I mean, if you think these two groups are semantically similar, then I don't know what's substantially different. Except maybe the Third Circuit where the fellow said something about gangs at one level and then changes it to LGBT at the second level. Yeah, if you compare the groups in this case to, for example, the unpublished decisions that the government cites in its 28J letters, the groups in those cases are way more different from things like social and economic status to female heads of households, like completely different groups. Here we have these key characteristics. But I do want to turn to our last argument on retroactivity as well, Your Honor. So even if this court finds that these rules should be upheld, there's the question of whether they should be retroactively applied to our client who was functioning at a time when it was standard practice to refine and reformulate social groups. You have an amicus brief from former immigration judges and board members acknowledging that that was their practice, that has always been the practice, and we have cited Doesn't the BIA say in this opinion that they're not trying to constrain the discretion of IJs to assist the petitioners? They do. This isn't about that. Of course it is, because they're trying to help them along, and I presume they're not going to lead them down the garden path into precisely the wrong definition. Well, we actually have cases, interestingly, where the court said that the IJ did lead them down the wrong path. But I think it's important that Congress has expressed its intent in the statute for IJs to play an active role in developing the record. So it's more of a collaborative relationship between the immigration judges, at least it should be, and the applicant in figuring out what the social group should be. And keep in mind, even though that's particularly helpful for unrepresented applicants, that statutory duty applies to represented and unrepresented applicants alike. It seems to me that IJ gave substantial help to the petitioner here. In this case, the IJ did attempt to give her several opportunities, but that's not always the case. In any case, in terms of retroactively applying this case, if you apply those factors in McDonnell v. Watt, this is a case where we see a departure from precedent. This is a case where we see substantial reliance on the old rule. This is a case where we see minimal harm to the government if this isn't applied retroactively to Ms. Contreras' case. Is that true even if we think the PSG raised before the BIA is substantially different than the one raised before the – I believe it is as long as it can be decided based on the same evidentiary record, which for the reasons articulated in our brief, it can be. And we do address nexus in the brief, Your Honor, on pages 22 to 23 of the opening and 12 to 13 of the reply brief. Thank you. All right. Thank you. Thank you.